The Surrogate.
This is an application upon the part of Mrs. Cynthia D. Rood, the petitioner, with George S. Everts, for a revocation of the will and codicils, four in number, of Lyman Soule, deceased, which were admitted to probate in this court, by decree, dated June-26, 1886. The proceeding for probate was instituted by the filing of a petition therefor, on the part of Charles G. Briggs, Esq., one of the persons named as executors in the third codicil to said will, on December 16, 1885, and the issuing of citations upon that day. Thereafter one Leroy Soule, an heir-at-law -and next of kin of said decedent, appeared in said proceeding by his attorney and counsel, and filed objections to the said probate. Eighteen other heirs-at-law and next of kin appeared by the same attorney. The petitioner in this proceeding was among the number so appearing. The issues thus joined were tried in part, evidence was given by all the subscribing witnesses to the will and codicils. The petitioner had rested her case, some evidence had been adduced upon the part of the contestants, when a compromise was .agreed upon, and the opposition to probate withdrawn, the residuary legatees, Howard Soule, Fanny J. Green, Mary S. Paige, and Charles F. Durston stipulating that the moneys bequeathed to them by the first subdivision of the thirty-first article of the third codicil should not be counted or treated as among the legacies, which by the third subdivision of said article, are made the basis of the distribution of the residuary estate. To carry this .agreement into full effect, the decree, at the request of all the parties through their attorneys, was made to embody a construction of the *240 will in conformity with the stipulation. The answer interposed by Leroy Soule, and by which issue was raised, attacked the validity of the attempted disposition of the property by the thirty-fifth and thirty-seventh items of the-will; the fourth item of the codicil of March 25, 1882, and the thirty-first item of the codicil of March 7,1884, and questioned the legal effect of the last two paragraphs-thereof, which are referred to in the stipulation and decree. The answer also alleges that the will and codicils were not the free or voluntary acts of the testator, but were procured by fraud and undue influence, and that the testator at the times of their execution, was not of sound mind, all of which was decided contrary to the allegations of the-answer, except that the will was construed in accordance-with the stipulation.
The petition for revocation of probate alleges that Lyman Soule, at the time of making the writings, purporting-to be his last will and testament and codicils, was not of sound mind or memory, or in any respect capable of making-a will; that he did not know their contents ; that they were-not witnessed at his request; that they were procured by fraud and undue influence; and that, after the execution,, the papers were altered, and other papers substituted in their place. Upon the last claim, no direct proof was given. The third codicil to the will, bearing date March 7, 1884, is shown to be in the handwriting of Charles F. Durston, who' is named therein as one of four parties to share equally in-the income of the residue of the estate, for the period of five years, and, at the end of that time, to have each one-fourth of $1,000. He is also named-as an executor. The-dispute over the testamentary capacity of the testator, and' the burden of showing that the codicil, so written by an interested party, was the free and untrammeled expression of the testator’s wishes, have been the chief sources of difficulty in the case.
The will and two of the codicils are quite long, and at-first some of the provisions seem intricate.
*241 At the time of the execution of the third codicil, the decedent was about ninety-one years of age. He had never been married, and his nearest relatives were nephews and nieces and their descendants, who are quite numerous, and all recipients, by the will and codicils, of his bounty. The length of the instruments is due principally to the large number of bequests, and the repetition of formal words. By the first clause of the will, payment of debts and funeral expenses is provided for. In the second clause is contained a devise of three farms to a brother (since deceased) and his descendants. The third contains a devise of the use of a farm for life to two nieces. The next thirty clauses of the will contain general money legacies to relatives and friends, including two lawyers, who had rendered services to the testator, and one of whom drew the will. The thirty-fourth clause contains gifts of $5,000 each to three charitable institutions in the city of Auburn. In the thirty-fifth clause the sum of $2,000 is set apart to provide means of caring for the testator’s family cemetery lots and surroundings, and, in the thirty-sixth clause, the same amount is appropriated to the purchase of a monument. By the thirty-seventh clause, the residue and remainder of the estate is given to the executors in trust, to invest the proceeds and pay the interest to nine relatives, who are named, in such proportions as the executors deem proper, during the period of ten years, and at the expiration of that time, to divide the principal among the lieirs-at-law of such persons in such manner as the executors may deem proper, in view of their conditions, wants and circumstances, it being provided that if any of such persons die within the ten years, the share going to the heirs of that person may be paid at once. By the next clause, the general legacies are made a charge upon the real estate, power of sale is given, and the time of payment of legacies is named. In the thirty-ninth clause, the time within which sales of real . estate are to be made (five years) is fixed, and a provision is made that the legacies of any parties who shall by suit *242 seek to compel a division of the estate or payment of a legacy which may make expense or cause loss, shall be nuh and void. By the fortieth clause of the will, Horace T. Cook, Charles G. Briggs and Howard Soule are named as executors ; and lastly, the will directs that should any of the heirs-at-law or next of kin contest or dispute the instrument, he shall take nothing from the estate. The will covers eighteen pages of legal cap paper, but, with the exception of the names of the legatees, and the amounts of their several legacies, its provisions have been practically indicated. The attestation clause is perfect, and the instrument appears on its face to have been duly signed and published.
The first codicil, bearing date March 22, 1881, witnessed by the same persons, refers to the will and particularly the third item thereof, and merely corrects the names of the two devisees named therein, which had been interchanged, applying the Christian name of the one to the other, and vice versa.
The second codicil, dated March 25, 1882, witnessed by the same persons, refers to the will. In the first clause is a devise for life of a farm to the testator’s brother (since deceased), and upon his decease to his grandchildren. In the second clause, is a legacy of $3,000 to Charles F. Durston. In the third, are legacies of $1,000 each to five clergymen. In the fourth, the thirty-seventh item of the will is quoted and revoked. The same provisions are then made for the payment of the income of the residuary estate, as in the will, except that the names of four of the beneficiaries are omitted. One new name is added. Of the principal, not to exceed one-ninth is given to the heirs of each of these parties, in the same manner that the residuum was directed to be distributed by the will to the persons named in item thirty-seven, and the balance to be distributed among the three charitable institutions named in the thirty-fourth clause of the will.
The third codicil, dated March 7, 1884, refers to the will and the former codicils. In the first clause, the farm, *243 of which the use is given to two nieces in the third item of the will, is devised absolutely to them, and one other niece; and each of the three is given $1,500. In the second clause, the legacies of three nieces are increased to $3,000 each. In the third and fourth clauses sixteen legacies are increased $500 each. In the fifth clause, a legacy of :$5,000 is reduced to $3,000. By the sixth clause, the sum set apart in the will, of which his housekeeper is to have the income, is increased from $1,500 to $2,000 ; and by the ninth clause, she is given the use of the testator’s residence for four years. By the seventh, eight, eleventh to eighteenth clauses inclusive, additional pecuniary legacies are given. By the tenth the provision of the will for a monument, which had been subsequently erected, was cancelled. In each of the nineteenth, twentieth and twenty-first items, the use of $2,000 is given to a nephew for life, and, in one case, the principal, after the nephew’s death, is given to his children who may survive him. By the twenty-second, twenty-fourth, and twenty-fifth clauses, legacies of $1,000 each are given to nine children and a grandchild of a nephew and nieces of the testator. By the twenty-third clause, the legacy in the twentieth item of the will to Howard Soule is increased to $5000. The twenty-sixth, twenty-seventh and twenty-eight clauses of this codicil specify the time at which certain legacies of the will and third codicil are to be paid. The twenty-ninth clause is an amendment of the thirty-fifth item •of the will, relating to the cemetery fund, providing that the income be expended under the direction of commissioners of the ‘ ‘ Soule Cemetery,” to be appointed by the common council of the city of Auburn. There are two clauses numbered “ thirty.” The first gives $1,000 a year for six years to each of the executors, in addition to his commissions. The next clause directs that the preceding legacies shall have a preference over the payments to be made under the •following item. The thirty-first clause has three subdivisions. After reciting the change made in the residuary clause *244 of the will by the fourth item of the codicil of March 25, 1882, it is as follows:
“ First. That Howard Soule, of Syracuse, N. Y.; Fanny J. Green, of Fort Byron, N. Y. ; Mary J. Paige, of Sennett, Cayuga Co., N. Y.; and Charles F. Hurston, of Auburn, N. Y., shall be the four (4) persons who, and their heirs that may respectively survive them, that shall have the income of my rest and residuary estate, willed to my executors, in and by said item fourth (and which may remain after satisfying the several legacies mentioned in my will, and in the codicil of date, March 25, 1882, and this codicil as they remain in force at my decease), of said codicil for the period of five (5) years, and my executors will pay over the same to them, share and share alike, annually, and in the event of the death of either of them, either before or after my death, then to pay over the share (one-fourth) to the heir or heirs of such person so dying; and, at the end of five (5) years to-divide among them or their heirs surviving them respectively, the sum of one hundred thousand dollars ($100,000), if there-be that sum belonging to said rest and residuary estate, and if not that sum to so divide, then -what sum there may be under said amount, share and share alike, or one-fourth of said $100,000 to each of said four persons, viz.: HowardSoule, Fanny J. Green, Mary Paige, and Charles F. Hurston,, or to the heir or heirs of either of said persons who may die before said division may be made.”
The second sub-division provides for the payment to-each of the three charitable institutions before named of $15,000 out of the residue of the estate, making-altogether $20,000 to each. By the third subdivision, the balance of the -property, if any, is divided among the legatees named in certain specified clauses of this codicil and the original will and second codicil, upon the basis of the sums given as legacies. The thirty-second clause contains a direction as to forfeiture by any legatee-contesting the will. By the thirty-third clause, Charles G.. Briggs, Charles F. Hurston and Howard Soule are named as *245 .'executors, Durston being substituted for Horace T. Cook; and, by the last clause of the codicil, it is provided as follows : “ If by inadvertence, I have omitted the name of 't any person or persons, who shall be heirs-at-law at my ^decease, I direct my executors to pay such person or persons | a legacy of one thousand dollars, to each of them, if they •see lit and proper.”
¡ A fourth codicil is dated May 21, 1885, by which the -above named executors are re-appointed, their powers as to transferring and selling securities, etc., are specified, and -authority given to the surrogate, in case of death or vacancy in the number, to appoint to such vacancy, first, George S. Everts ; second, Silas Wright; and third, George H. Green.
This analysis of the will and codicil is thought to be proper, in view of the contention upon one side of the case, that a person, in the feeble condition of the testator, could not have understood the provisions of the will, owing to , their intricacy; and, on the other side, that the will and codicils are simple in their meaning and purport, and, if at -all involved, only so in their legal phraseology. Counsel for the proponent says the scheme of the testator was simple, and what he intended is perfectly evident. The difficulty is not as to what was in the testator’s mind, but as to whether the language used expresses his intent. The counsel for the contestants argues that the provisions of the residuary clause are of doubtful legality, as being in contravention of certain statutes, and claims this is evidence that they were not understood by the testator. If the decedent is found to have been of testamentary capacity at the time of the execution of the will and codicils, being a man of unusually advanced age, and consequently of weakened powers, in the circumstances of the case it is necessary to decide that he fully understood the nature and consequences of his testamentary act; and this must be determined from evidence aliunde the formal execution of the will. The fact that a will is illegal in some of Its provisions can be no evidence to show that the attempted disposition *246 was not understood, unless the testator was a lawyer, and well acquainted with the law. It would appear most useful to endeavor to view a will from the testator’s standpoint, rather than that of the scrivener who drew it, and, if it appears that the will as dictated by the testator, was comprehended by him, and that his ideas had been accurately expressed in the will, although in language more obscure than-is ordinarily used, and not readily understood by a stranger,, it must be held that the will, in this respect, complies with the law, although for some other reason, it may not do so.
The first inquiry, however, in this case, is : Did the testator have legal capacity to execute a will at the times of signing the will and codicils ? Much evidence has been given upon this subject by the argument of the counsel for the contestant that Lyman • Soule did not have mental ability to make a will of any kind and under any circumstances.. On the contrary, it was conceded he might have made a lawful will at the times of the transactions in question.. The evidence to support the theory of mental unsoundness was : the age of the testator, impaired sight, attacks of vertigo attended by brief unconsciousness, forgetfulness,, losing his way and having to be assisted home and sometimes to his room, physical exhaustion, inability to read papers, making radical changes in the disposition of his property in the last years of his life, frequently declaring-that he could not do business, and surrendering up most of it into the hands of others. One witness testified to an occasion when Mr.. Soule had an attack in a store in 1880,. when he fell'out of his chair and remained unconscious until after a doctor had been brought in and had administered some-remedy,—more than twenty minutes. It is not proven what the character of the illness was, but it appears by the-evidence of the same witness, that “ Uncle Lyman,” as lie-was called, came to the store the next day, and asked if he-had done any damage, and requested that the matter be kept quiet. One witness testified to meeting Mr. Soule near the city limits when he appeared to be lost,—in 1883 *247 or 1884. The snow was deep and the witness took him in his sleigh to ride home. He asked witness what certain places were, with which he had been familiar. He was in the sleigh six or seven minutes, and, before he reached his home, he expressed surprise that he had gotten lost. Several other witnesses tell of meeting him when he inquired for places which had been well known to him. In nearly every case, it is shown that Mr. Soule appreciated the information given, and usually acted in accordance with it. Considerable evidence is also given to show that he failed to recognize people, and forgot that he had met them a short time before. It does not always clearly appear why he did not recognize them, but, in most instances, it does appear that he acted rationally upon being told who the persons were. Even upon the evidence presented by the contestant, the condition of mental alienation, if such it be, was not continuous, and fails to establish the theory of senile dementia.
Upon the part of the proponents, it is shown, that, up to the time of the execution of the third codicil and subsequently, the testator collected money upon mortgages, and for rent of houses owned by him, gave receipts therefor, and appeared to the persons with whom he transacted business to lie able to understand what he was doing. In October, 1883, he received money upon a mortgage, signed a receipt for it, and indorsed the payment upon the mortgage.
The party who made the payment had had many similar business transactions with him, and did not notice anything unusual. In January, 1884, an attorney-at-law, who was acquainted with Mr. Soule, came to see about selling him a mortgage, found him at the bank, where he had his desk and papers, told him about the mortgage and what he wanted. The testator"agreed to meet him at his law office at two o’clock in the afternoon. He met his engagement promptly, examined the mortgage, objected to it because it ran too long, and finally refused to take it, because of the time and of its being payable in small installments. The witness observed nothing different from what he had seen *248 of the testator for a good many years. A few weeks before he had a conversation with him in regard to a lawsuit, which had been tried in 1855. The testator told over the details, of which the witness was cognizant, accurately and rationally, and inquired interestedly about people they had both known in former years. The testator was a member of a fire company. He occasionally met the members at their house, as late as 1882 or 1883. He lent the company $200, in 1881 or 1882, and took a note. Payments were made from time to time. At one time he made them a present of $50. In September, 1884, the note was placed in the bank for collection. He met one of the men, who had made payments, and told him the note had run long enough; whereupon the note was paid.
In 1884, one of his tenants, who kept a restaurant, told him he wanted more room. Mr. Soule said the tenant next door was going out, and he would see what he would do for him, but advised him not to be too hasty about it. In November, 1883, he made a contract with one of his tenants for the sale of a store, title to pass on May 1, 1884. The deed was given at the time named, a mortgage given for a part of the purchase price, and a check to Mr. Soule for the balance. The negotiations were made in person. Pending the negotiations, he asked a friend to go in and look at the store. When told that he didn’t want to buy, he replied : "I would like to have yon go in and look at it anyway.” This was done. Two or three times afterwards, and in 1884 or 1885, he told his friend he had sold the store, intimating that the looking at it had stirred the matter up, the purchaser being the occupant at the time. In the fall of 1885, a short time before his last sickness, he drove out to his tenant houses. He mentioned particular houses he wanted to see, expressed pleasure at riding, asked the man who drove to take him to the barber shop to be shaved. He became ill, and concluded to go home. The driver says he said nothing out of the way. In 1884, he met the husband of one of his nieces, who lived in Sennett, where he had form *249 -erly resided, and asked him if a certain farm would bear a ••$13,000 loan. At one time he said to this witness : “ John, when you go home, tell your young minister I have been making a new codicil to my will, and have left him '$1,000.” This young minister was one of the clergyman, named in the second codicil as legatee to the amount of '•$1,000. Subsequently he told this witness he was going to make a new codicil, and put Mate’s name in it. After that, an 1884, the witness met him, when lie said : “ John, when you go home, you tell Mate I have been making a new codicil to my will, and have put her name in it.” (Mate was the witness’s wife, and one of the principal residuary legatees.) He then showed the witness a list of his property, mortgages, etc., which be had to collect.
A large number of mortgages and checks, bearing the endorsements of the testator, were read in evidence, also checks signed by him. Twenty-eight checks were presented which were tilled out and signed in the handwriting of the testator, bearing date of 1884, which had been presented •and paid at the bank in the usual course of business. There were also produced fifty-two checks, issued in 1885, all bearing the autograph signature of the testator, but tilled out by others ; and fifteen checks made the same year, which were •both filled out and signed in his own handwriting, and which had been regularly paid.
One witness produced by the proponents testifies to being with Mr. Soule upon two occasions, the last about four months before his death, when lie was ill upon the street, •and Mr. Soule told him that he had one of his dizzy spells, .said that he had had them some little time. About six months before, the witness walked with him, when he had one •of the dizzy attacks, which passed off after a time, when he •said he was all right, and the witness left him. The wit-mess says the testator always recognized him, and that he met him frequently up to the last month of his life.
It is proven that the testator’s habit, until a few weeks before his death, was, about eight o’clock in the morning, to *250 go to the National Exchange Bank, where he had his papers, at first in tin boxes kept in the vault, and, from the spring-of 1884, in a safe procured for that purpose. The bank was over a quarter of a mile from his residence. He would often be the first person to arrive in the morning. He was-a director of the bank, and had a'key to the outer door. He would ask the teller of the bank for his tin boxes, and, going-into the back room, would take out his papers and examine them. Payments were made to him there, and receipts-either drawn by him or by the cashier of the bank, and signed by him, were delivered; and the papers being returned to the tin boxes were again placed in the vault, or were put in the safe. The cashier and teller of the bank, who saw him and conversed with him nearly every day, saw nothing irrational. The county clerk testifies that for many years, and down nearly to the time of his death, Mr.. Soule brought papers, mortgages and assignments to his office, to be recorded, and frequently asked him to examine-the records to ascertain if there were any prior liens' upon the incumbered property; and would ask. for and takeaway papers which had been recorded. • The office was over a¡. half a mile from his residence, and he usually walked to it. On one occasion, a short time before his death, the witness-saw him getting on a street car, and expresses surprise at his-riding, as it was so unusual an event; when Mr. Soule replied : “ Ho didn’t think he would get there himself.”
One witness, who rented a store building of the testator, testifies that he paid him the rent monthly, down to near the time of his death, and took receipts, all of which were in Mr. Soule’s handwriting down to June 1,1885. Receipts given in June and July, 1885, -were drawn by the witness, and signed by Mr. Soule, at the witness’ place of business.
The testator died November 28, 1885, of acute bronchitis.
The will and first two codicils were witnessed by two-gentlemen, who were officers of and in daily attendance at the bank where the testator had his papers, and of which *251 lie was a director. They knew him intimately. One of the witnesses, Mr. Newton, had been acquainted with him fourteen years, had seen and conversed with him almost daily from the time he brought his .papers to the bank, in 1878, to about three months before his death. He had known of his extensive business transactions, and had taken part in many of them, both as an officer of the bank, and as an assistant of the testator. He, as well as the other witness,, testifies unqualifiedly to the opinion that the testator was of sound mind and memory, and in all respects competent torn ake a will at the time of the execution of the will and first two codicils in question. The third codicil was attested by men who were acquainted with Mr. Soule. One of them was a physician who had attended him professionally upon two occasions, and who testifies to a conversation with-him at the time of the execution of the third codicil.. Both witnesses say unequivocally that, in their opinion, the-testator was at that time of sound and disposing mind and memory. The witnesses to the fourth codicil, dated May 21, 1885, were both well acquainted with the testator. One-was a neighbor. Both of them say? without hesitation, that he appeared in his right mind, and seemed to exercise his-own free will.
In addition to the evidence of the acts and conversations-of the testator, extending over a period of several years-immediately prior to his death, and the opinions of some-of the witnesses, who were called to detail them as to the-impressions made at the time by such acts and speech, and the opinions of the subscribing witnesses to the will and codicil, expert testimony has been given. Four physicians on the part of the contestant; and three, including the-State commissioner in lunacy and the superintendent of the State asylum for insane criminals, on the part of the proponents, were produced as witnesses. They testified totlieir opinion, in response to hypothetical questions propounded by the respective counsel. To a question presenting very fairly the principal facts established by the whole- *252 •evidence, five of these witnesses agreed in giving the opinion that a person thus described would be one of sound mind. The other two witnesses answered in reply to a question embracing only the facts testified to by a portion of the contestant’s witnesses, and without the benefit of the •entire history given in the case. ,
Upon the whole evidence, the conclusion is imperative that the testator, at the time of the execution of the will and codicils, possessed legal testamentary capacity, that he was able to understand the condition of his property, his obligations to those who were related to him by ties of ¡blood, or who had legal or moral claims upon him, and the character and effect of the provisions of his will and codicils. While it appears that his perceptive powers and memory were somewhat impaired, as would be naturally supposed in a person of his advanced years, his regulative faculties and business acumen are shown to have been remarkably well preserved. Cases may be cited in which legal capacity to make a will has been upheld, in which there is apparently much less ground. The case of Horn v. Pullman, decided by the court of appeals. in 1878 (72 N. Y. 269), involved •the question of the testamentary capacity of a man eightytliree years of age, who was suffering from infirmities incident to advanced age, and had been previously afflicted with .Sickness, which left him enfeebled in body. His sight and memory were considerably impaired. He took no active part in business for several years before his death, which occurred within three months after the execution of the will. He had grown more reserved and less cheerful than formerly; would repeat questions sometimes two or three times during a conversation. He did n'ot recognize readily some persons with whom he was acquainted, and had to be told who they were. The evidence altogether showed that the testator’s mental and bodily powers were impaired, but failed to show that he did not understand his relations to his family, the condition of his property, and the effect of his will. There was evidence in the case of circumstances *253 tending to show that he acted intelligently in the transaction of some trivial matters of business. The physician who attended him during the last years of his life, and who-was one of the subscribing witnesses to his will, testified that his memory of recent events appeared to be impaired,, and that he was bodily and mentally infirm, but, in the witness’ opinion, these infirmities did not affect the testator’s-competency to make a will. The court adopts this view of the case, and lays down the rule that a will should be sustained, if the testator is shown to have had sufficient intelligence to comprehend the condition of his property, his-relation to those who are or may be the objects of his bounty, and the scope and meaning of the provisions of his-will, provided it be his free act. Many cases might be cited to show that mental impairment alone is not deemed sufficient to defeat a will, if the person who made it appears to-have had sufficient understanding to appreciate its effect. The courts have also held that a person who has sufficient capacity to make the simplest will, who is compos mentis can make any will, even the most complicated (Delafield v. Parrish, 25 N. Y. 9, 97).
Within all the authorities it must be held that Lyman Soule had legal testamentary capacity at the time of the execution of the will and at the times of executing the codicils. His numerous business transactions and conversations all conclusively prove that he was compos mentis.
A question of more difficulty to decide, upon all the facts of the case, is, whether the instruments admitted to probate, as the last will and testament of the testator, and as codicils thereto, were fully understood by him, and were his own free acts, or whether they were obtained by undue influence.
Had the parties who wrote the instruments in question been .entirely disinterested, and the testator been in the full possession of his normal faculties and senses; had his sight been good ; his memory unimpaired ; and his actions independent ; the presumption would follow that he fully under *254 stood the provisions, and desired to have them carried into effect. But the will and first two codicils were written by a lawyer, who is made a legatee to the amount of $2,000, and the third codicil was drawn by and is in the handwriting of another lawyer, who is given thereby one fourth of the income of a large residuary estate for five years, and, at the end of that time, the sum of $25,000, and who is named therein as an executor, at a salary of $1,000 a year for six, years, in addition to the commissions allowed bylaw. Upon the issue as to undue influence, the question of the burden of proof is, in the circumstances, not free from difficulty, and the decisions of the courts, in other cases, have been examined to ascertain the proper rule to be adopted in the present controversy. The case of Mark v. McGlynn (88 N. Y. 357), was one in which the testator had made a will in favor of his religious adviser, and the question of presumption as to undue influence was raised. The court held that it is not sufficient to show that a will is the result of affection or gratitude or the persuasion of a friend or relative, which he may legitimately use, but the influence must be such as to overpower the will, producing a disposition of the property, which the testator would not have made if left free to act. Where, however, a weak minded person makes a will in favor of his priest or confidential adviser, to the exclusion of the natural objects of his bounty, the law presumes undue influence, and, in order to sustain the will, there should be some proof besides the making of it. This presumption, however, is one of fact; and, where the evidence tends to show that the will was the voluntary, deliberate act of a person of ordinary intelligence prompted by affection, without improper persuasion, and the will is not unjust, a decree admitting it to probate will be upheld.
Two kinds of undue influence are referred to as being recognized by the law; one of coercion or threats of injury, by which a person is compelled to act contrary to his desire, which cannot often occur under the present system of execuring wills ; the other and more common one, in which the *255 mind of the person is wrought upon through constant persuasión, and mental or moral pressure, or appeals to hope or fears, continued until the victim, for the sake of peace, is compelled to surrender his own wishes, and do an act which he would not do or desire to do, if left freely to act at his own pleasure. The case of the will of Martin (98 N. Y. 193) was one in which probate was contested on the ground of undue influence. The testatrix left three sons, one of whom .was named as executor of the will. He had communicated to the scrivener the provisions to be inserted in the will, and was himself a beneficiary. It was alleged against the will that it was obtained by undue influence. The court held that the burden of establishing the defense was upon the parties making the attempt, and as the testatrix was found to have had testamentary capacity, and a present knowledge of the contents of the will, it was held that it could not be avoided, except by proof of influence amounting to force or coercion.
• The case which has been most urged upon the attention of the court was an authority, and which, in many of the facts involved, is most like the case at bar, of the decisions of our highest court, is that of the matter of the will of Smith (95 N. Y. 516). Eliza M. Smith, at the time of making her will, was over seventy-five years of age. She had no near relatives. The lawyer who drew her will, was the chief beneficiary. The testatrix was infirm, mentally .and physically. She had made three previous wills, two of them made in the same year as the last. In each of these, the contestant was named a.s legatee. In the first two, she -was residuary legatee, but, in the third, the proponent was named as residuary legatee. In the fourth will, the one in question, the contestant was not mentioned, and the draughtsman was given the bulk of the property. The will was drawn and executed five days before the death of the testator. The court says, the fact that the beneficiary was the attorney of the decedent, does not alone create a presumption that a testamentary gift was procured by fraud or *256 undue influence, but, when a person of advanced years and mentally and physically infirm, has made his attorney the principal beneficiary, and it appears that this was contrary to previously expressed testamentary intention, that the attorney was the draughtsman. of the will, and took an active part in procuring its execution, and that the testator acted without independent advice—the burden is imposed upon the attorney of satisfying the court that the will was the free, untrammeled, intelligent expression of the intention of the testator.
The case at bar differs from all the cases cited to such an extent that the burden of proof upon the claim of undue-influence is left almost entirely to the judgment of the court, as a new question. It may be said that propriety at least would dictate that a person deriving a benefit from the will of another should not conduct the affair. Qui se scripsit haeredem, or whoever draws a will in his own favor, does a thing which ought to excite the suspicion of the court, and call upon it to jealously examine the evidence and be judicially satisfied -that the paper propounded' expresses the true will of the 'deceased, before admitting it to probate. The fact that the testator had full testamentary capacity, and knew the contents of the will, is sufficient to remove such suspicions, and to place the burden upon the contestants of proving undue influence. It was said by the surrogate in Wilson v. Moran (3 Bradf. 172, 180): “ A will by a client, in favor of an attorney, is not absolutely invalid.' In such a case, there is no testamentary incapacity,, but still the circumstances call for the largest degree of circumspection and vigilance to see that the act was in consonance with the views and wishes of the testator, and was-not the result of influence, exercised through the medium of the existing confidential relation...... It is in substance a rule of evidence to the effect .that proof of formal" execution alone is not enough to force a conclusion, and’ that, even after the factum, is formally established, the burden remains upon the proponent to show by additional *257 testimony, spontaneousness and volition.” In view of the propositions contained in the will of Smith, supra? the doctrine laid down in Wilson v. Horan is only to he applied where the testator is shown to have been dependent upon his attorney for information concerning the contents of the will; or where the testator was an infirm person and! the provisions of the will are such as to create suspicion, of the circumstances under which it was executed are such as to lead to the inference of undue influence ; as in the case of Rundell v. Downing (5 N. Y. State Rep. 253). It does not appear what may have been Lyman Soule’s purpose as to the disposition of his property prior to the will, executed) June 24, 1880 ; or that he was then mentally infirm. The legacy to the attorney who drew the will, was small, compared to the size of the estate. It would not seem to be unreasonable to assume that the legacy was given in consideration of services rendered. There is not enough evidence to raise the presumption that this gift was procured by fraud or undue influence, and, if there was, the will being republished, at the time of the execution of the third) and fourth codicils, when other advisers were employed, no other evidence need now be considered as regards the validity of the will and the first and second codicils.
Before proceeding to examine the evidence relating to the third codicil, as the proponents have referred to the fact that this petitioner, upon probate, consented to the decree which she seeks to overthrow, it may be proper to refer to some authorities upon the question of the burden of proof in a proceeding like the present for a revocation of probate» In an early case in surrogates’ court of New York county (Collier v. Idley’s Executors, 1 Bradf. 94), the history of the law relating to proceedings for the revocation of probate was carefully examined, the law was expounded substantially as in the case of Gouraud, in the court of appeals,, infra, and the question of the onus of sustaining the allegations against the will was fully considered. It was there contended, upon the part of the proponents, that the probate *258 of the will was prima facie evidence of its validity, and that the burden of overthrowing it lay with the contestant. The surrogate held that the proponents were bound to prove the will by original proof, independently of the first trial, but said that: “ Where allegations are filed with the view of raising some issue, narrower than the broad and general one of invalidity of the will, and the incompetency of the proof, if such a course be regular, the rule of evidence, as I have laid it down, may perhaps be varied.” The case of (Post v. Mason et al., Executors, etc., 91 N. Y. 539), was an action brought in the supreme court to have the probate of a will vacated, and the defendants adjudged to hold property as trustees, which had been given them individually by the will. One of the defendants was an attorney at law, who, at the death of the testator and for one or more years previously, had been his friend and counsellor. He wrote the will, and was named as one of the residuary legatees. The testator’s property amounted to about $200,000, and the attorney’s share was about $17,500. The court of appeals in its opinion in that case, says : “ The relation of attorney and draughtsman no doubt gave in the case before us the opportunity for influence, and self-interest might supply a motive to unduly exert it; but its exercise cannot be presumed in aid of those who seek to overthrow a will, already established by the judgment of a competent tribunal, rendered in proceedings to which the plaintiffs were themselves parties, nor in the absence of evidence, warrant a presumption that the intention of the testator was improperly, much less fraudulently, controlled.”
In the present case, the testator was a person of advanced years—about ninety—when the third codicil was executed, he was physically infirm, he was slow of movement, his sight was poor and he depended upon others to read to him. This instrument was, in respect to the most important provisions, contrary to his previous will and codicils. The attorney and draughtsman was one of the chief beneficiaries. These facts require that the proponent should satisfy the *259 court by a clear preponderance of evidence that the testator fully understood the nature and consequences of the testamentary act. There is no direct proof of any attempt on the part of the attorney or those who were associated with him, to induce or influence the testator to make this codicil. 'There had been one quite radical change in the testamentary disposition of the residuum of his property, made by one of the former codicils, before the parties who assisted in the making of the third codicil, were brought into service. Four of the nine original residuary legatees had been left out, and one new name added. It is proven that Mr. Soule had repeatedly, after making the will, expressed his satisfaction with his relatives. He did not live with any of them, or have much intimacy with them. He was heard to say of Howard Soule, who continued throughout to be one of the residuary legatees, that he liked him because he stayed away from him and didn’t bother him ; that he didn’t come until he sent for him. There is evidence of expressions of affection for Mr. Durston, the attorney who drew the third codicil, made by the testator in the years 1884 and 1885. One witness says he had a conversation with Mr. Soule in Mr. Durston’s office in August, 1884. When asked if it was not hard for him to come up stairs into the office, Mr. Soule had said : “ Yes, it is some; still at the same time, I make it my business, if I can, to see Mr. Durston once a day, for I like the man very much.” Another witness was in the office in the spring of 1885. Mr. Durston went out to the bank. Mr. Soule, sitting there, said : “ Charley is a good boy, an awful good boy ; I wish he was my son.” Another witness says Mr. Soule, in speaking of Mr. Durston, in 1885, told him he was his best friend, that he thought a great deal of him, and considered him a very honest man ; and that he had said in substance the same thing to him at different times before. Another witness tells of hearing Mr. Soule speak in high terms of Mr. Durston in 1884, and of calling him his boy.
In the second codicil, dated May 25, 1882, in the mak *260 ing of which it does not appear that he took any part, Miv Durston is made a legatee to the amopnt of $3,000. It appears that the testator was very frequently in Mr., Durston’s law office, in the years 1884 and 1885, and, that, to enter the office, he had to climb a very long flight of stairs-with considerable difficulty. Durston attended to the decedent’s law business, supervised his loans, made collections for him, and thus much of his time was occupied during the last three or four years of the testator’s life. It does not appear whether he received any other compensation than, the legacies named in the will. It is shown by the will and codicils that Mr. Soule made provisions in this way to compensate other lawyers, and, in one instance, it is upon condition that no other claim be made. The amount given toDurston is stated to be about six per cent, of the testator’s property. Prior to the execution of this codicil, the testator-told the husband of Mrs. Paige, one of the four principal-legatees, that he was going to put his wife’s name in it, and afterwards told him he had done so. The legatee had been named in the original will as the recipient of $2,000. With the exception of the change in' the residuary clause of the will, above mentioned, the scheme of the third codicil,, both as to the persons benefited, and the proportionate amounts bequeathed is practically the same as before. The amounts of most of the general legacies are increased, and all the relatives are remembered. From the evidence of the housekeeper, called by the contestant to show the testator’s infirmity, it appears that, during the time of the preparing the third codicil, lie was obtaining the names of the children of his nephews and nieces. There is evidence that the testator knew the contents of the will from the fact that the first codicil was expressly declared to be made for the purpose of correcting a mistake in the will. The naming of so many relatives of remote degrees of affinity was presumably the act of the testator or done at his dictation, as, in the absence of any member of the family, the lawyer who drew the instrument would hardly have been expected to have *261 (known them. The claim is fairly made that the execution -of the fourth codicil, the testator being shown to have been compos mentis, proves presumptively that he knew the contents of the third codicil. Changes made in the provisions of the will, increasing legacies of many parties who were not present, or represented, and diminishing those of others, seem rather to support the theory that the testator directed the changes, than that they were the work of a few conspirators. By the will and first two codicils, about $75,000 is given in general legacies, three farms are devised, and the residue of the property is divided among six relatives and three charitable institutions. By the will, as altered by all the codicils, about $116,000 is given in general legacies; the farms are disposed of in the same manner; the income of the balance is given to .four persons, three of whom are relatives, for five years; $100,000 is then to be divided between the four ; the three charities are bequeathed $20,000 -each, and the residue of the property is given to relatives, in proportion to their general legacies. Assuming the property to be about $500,000 in amount, as conceded, it will be seen that the latter disposition of the property is more equable. It is more favorable to all the relatives, except the few who happened to be preferred in the earlier instruments. While a disposition is shown to be more careful in providing for all the relatives, no more cogent reason than -the donor’s whim is given for preferring one to another.
It is. in proof that the day before the third codicil was executed, the testator, his nephew, Howard Soule, Charles G. Briggs, one of the executors, and Charles F. Durston, were together in a room in the latter’s office, with the door shut. The law partner and the clerk of Durston were aware -of the fact that the parties were together, and the clerk was instructed not to allow interruptions. A draft or memorandum of the will had been previously made, which was read over to the testator by Howard Soule, who says this was his second visit to Auburn, and the first time he had seen itlie testator upon this business. After reading the draft, *262 and, at the request of the testator, he furnished him with names of the children of his (Howard’s) brother, who were afterwards included in the codicil. He made an appointment to come again the day following. He came from. Syracuse the next day, as agreed, saw the engrossed codicil in the morning, and read it in part to the testator. In the afternoon, he read the whole of it to the testator. This wastlie same day upon which it was executed. He now identifies the original instrument as the one lie read before its-execution. He was present throughout the signing and witnessing of the codicil. The following day he made and took away a copy of the paper and also received a copy of the will and first two codicils. It is urged in support of the good faith of the parties, who took part in the transaction,, that Howard Soule would receive less property under the third codicil, than be would have had if it had not been made,. It appears that he had no acquaintance with the attorney who-drew the codicil, until the week it was executed. He is not proven to have had any motive to urge the change in testamentary provision. The changes made by the codicil were-presumably within the knowledge of Mr. Charles Gf. Briggs,, one of the executors, named in the original will as well asthc codicil. The clause of the third codicil, which has been criticised, is very plainly written. The names of the legatees are mentioned in full, both at the beginning and end of the first subdivision. The amount of the legacies is both written out and twice stated in figures. It would seem impossible to even glance at this subdivision of it, without-learning who the beneficiaries are. The fact that the codicil was read to the testator by his relative and chosen adviser, is fully established. It cannot be held that Lyman Soulewas the victim of deception or imposition, without involving all the parties who were present at the time the codicil was prepared, in an unlawful and contemptible conspiracy. The facts do not create such a jiresumption. In the absence of positive proof or circumstantial evidence, sustaining such *263 a conclusion, and admitting of no other reasonable hypothesis, the finding must negative the theory of fraud.
The conclusion is that, at the time of the execution of the third codicil, the testator was of sound mind and memory,^ and competent to make a will; that the codicil was his free act, and that it. was in all respects properly and legally executed, and that the testator was not under restraint.
It is claimed on the part of the respondents in this proceeding that the petitioner is estopped from maintaining it, by the fact that she has derived a benefit under it, and accepted money paid in pursuance of the decree admitting-the will to probate. Certain concessions were, at the request of the parties, granted upon probate, and incorporated in the decree, as stated above. It is not demonstrated, nor is it clear to the court, that the petitioner derived any practical benefit from the adjudication in this respect. It is proven that, after the will was admitted to probate, the petitioner, Mrs. Rood, as assignee, received, from the executors, a legacy of $500, given by the third codicil to George A. Rood, her son, less the rebate of interest. It is now urged that, by this act, she is estopped from controverting the provisions of the decree. Upon the trial of this proceeding, after the evidence was closed, the petitioner, by her counsel, made a tender in court, of the sum of $496.85, stating that he desired to tender the amount advanced to Mrs. Rood, for George Rood’s claim, and interest to date, and to deposit that amount in court for the benefit of the estate. No objection was made to the form of the tender. Two question are thus presented ; first, was the petitioner, Mrs. Rood, estopped from contesting the validity of the will by accepting the money ? second, if she was so estopped, does the tender or offer to return the money, after the proceeding was commenced and continued nearly to a completion, restore her to the position she occupied before the money was received ?
It will be seen by the following authorities that, after some difficulty, the courts have decided that a decree upon *264 probate of a will, does not preclude a party who opposed it from litigating over again the same questions in a proceeding like the present. It was decided by the General Term „of the supreme court, in the First Judicial Department, in 1883, in the matter of the will of Gourand (28 Hun, 560), that it was not the object of the statute relating to a revocation of probate of -a will, to allow next of kin who had filed objections to the original probate, and contested it, to file the same objections, and enter upon a new contest on the issues already tried and determined. This decision was .overruled, however, by the court of appeals (95 N. Y. 256) and that court held that upon a proceeding for revocation of probate, the whole case was left open, and that the contestant had the right to have the same question then litigated, tried and determined, the same as if no adjudication had been had thereon. The court says, a party desiring to contest the probate in that way, has the right to try over again apon the same, or upon -additional evidence, the very questions which were litigated when the will was first proposed for probate. If the petitioner has been precluded from obtaining the relief asked for in her petition, it must be by her acts in relation to the decree and the parties interested therein, and such as to constitute an estoppel in pais. The acts or admissions relied on must have been intended to influence the party setting them up; they must have had that effect, and the denial of the admissions, and the grounds supon which the acts were based, must operate to the injury of the other party. A party cannot enjoy the rights awarded to him by a judgment of decree, and repudiate its force as an adjudication. The case of Mills v. Hoffman (92 N. Y. 181), which originated in this court, is in many respects similar to the one at bar. An action had been brought by a legatee against an administrator with the will annexed and others for the purpose of determining the rights of the parties in the estate and for an accounting. A judgment had been ¡rendered in the action, determining the questions involved and adjudging that the administrator, upon compliance with *265 "its terms, be discharged from all demands. The administrator performed the requirements of the judgments, and paid over, -among others, the share of the defendant, who was then an infant. The payment was made to her general guardian. .After the defendant became of age, witli full knowledge of ifhe terms of the judgment, she received from her guardian 'the moneys so paid to him. She also instituted proceedings to vacate the judgment, upon the ground that the appointment of a guardian ad litem for her in the action was .irregular. An order was granted vacating the judgment so 'far as she was concerned. Four years afterwards she commeneed proceedings in surrogate’s court to compel the ¡administrators to account. It wras held, upon appeal, by the court of appeals, that the proceedings were not maintainable. That although the judgment in the action had been deprived of any force'as an adjudication, she, by the acceptance of the money paid, estopped herself from controverting either the judgment or the settlement made thereunder.
In the case at bar it appears that the petitioner did receive the money from the executors of the will. A party who takes personal property under a will, to a certain extent derives title from the probate. The petitioner would not have had a right to demand payment of the bequest, except for the decree admitting the will to probate. By the statute •authorizing the proceedings for revocation the effect of the decree as an adjudication was suspended, except for the act of the petitioner, in accepting the fruits of the decree, and of the will as thereby established. At the time this proceeding was instituted, she had in her possession the money •which she had received in the nature of a bequest, and to which she or her assignor would not have been entitled, if the will had been denied probate. I think the petitioner was not at liberty to repudiate the terms of the decree, which •she has ratified in accepting the bequest; and that she is estopped from claiming a revocation of probate, unless by ¿her subsequent act she had made full restitution.
Did the tender of the money in court have the effect to *266 restore the petitioner to the rights she possessed to contest, the will by a proceeding like the present ? A tender made-in court, for the purpose of avoiding an estope], is an anomaly. The theory of a tender is that the party who is-injured by the act of another receives sufficient amends in accepting a tender, and ought not to be allowed to further maintain his action or hold his security. There are different kinds of tender ; those which are held to discharge the-debts, and those where an offer is made of purchase money,, upon condition of the delivery of a deed, or of the payment of a debt, on condition of the return of a pledge. The-Code provides for a tender, after suit has been commenced, in actions for a sum of money only. At common law, payment of money into court was made when tender had been made before suit brought, or when no such tender had been made, if leave was granted by order of the court. Our courts, in some rare instances, have held this rule to -be in force. Had the petitioner made a lawful tender of the money received for legacy, for the purpose of making full restitution to the representatives of the decedent’s estate, before filing her petition in this proceeding, it might well be-said that no injury could thereafter have been alleged on the part of the executors. Having proceeded to obtain a. revocation of probate, and,caused costs and expenses of a trial, it would be contrary to precedent to allow a tender or deposit of the original amount, with interest, to avoid an estoppel, at the close of the trial, if it could have that effect at any timé after the proceeding was instituted. In the-case of Hunter v. Lecompte et al. (6 Cow. 728) it was-held that if costs had been incurred by a landlord in dis-training goods for rent, a tender, to take away the right of' distress, must include the costs. The" court says it is highly reasonable that costs should, be paid when they have been-properly and fairly incurred. It was so held, also, in the-case of Eaton v. Wells and others, (22 Hun, 123)—an, action for the forclosnre of a mortgage, in which a tender of the amount of the mortgage, without costs, was made- *267 after suit was brought, and without an order permitting a tender without costs. It is very doubtful, however, if any tender or deposit of the moneys in court, after the commencement of this proceeding, could be of avail to the petitioner. It has been held in another State that where-an execution has been levied on goods .and chattels, which, have been sold, and the proceeds paid over to the creditor, he cannot maintain an action to obtain a new execution upon the ground that the goods were not the property of the-debtor, until he has refunded the money thus received or tendered it back (Batchelder v. Wason, 8 N. H. R. 121). In a case in this State, in which the plaintiff sought to recover on one of two notes,-the consideration of which was the assignment of a judgment, held by him against the defendant’s bfother, it was proven that, after its-maturity, the note was transferred to the plaintiff, and the-judgment assigned to him also. There was no offer made by him to assign the judgment. The court held that, if either party would sue upon this agreement, the plaintiff for not paying or the defendant for not transferring, the one must aver and prove a transfer or tender, and the other a payment or tender (Berringer v. Wengenroth, 6 Hun, 531).
Both upon principle and authority, I think the tender or offer of deposit came too late to affect the question' of estoppel, and that it was properly urged as a bar to this proceeding.
An offer was also made at the same time to add another-party as petitioner, against whom it is not shown the same defense could be made, but, as the statutory time of limitation of commencing the proceeding is passed, and some of the parties are infants, and all are not represented, the-amendment cannot be held to give the new petitioner the same rights she might have had, if joined originally in-the petition.
It is claimed by the petitioner that the trust attempted to be created by the will, and the thirty-first item of the-third codicil, are prohibited by the statutes against perpetu *268 áties, and are consequently void. The law limits the suspension of the absolute ownership of personal property to two lives in being, at the death of the testator, and it ds contended that the ownership of the property cannot be .absolutely determined until after five years, which may exceed the time allowed by statute. It is also urged, that the will violates the statutes forbidding a direction as to the ae•cuinulation of interest except for the benefit of minors. The decision of these questions, which are perplexing, is not 'useful or proper at this time. The inquiry now is, whether the will was legally executed, and if it' shall stand as proven, or if probate shall be revoked, and the will or codicil be set aside. The construction of the will, and the decision as to the legality of particular provisions, must be had either arpón the judicial settlement of the accounts of the executors, or a proceeding for that purpose, or in an action brought dn another court.
It being determined that the will and codicils were duly signed and published by a competent person, that they were his free acts, and that lie knew and appreciated their provisions and effect, this application is denied. Costs are allowed to the successful parties from the estate.
Note on Estoppel by Election of Acquiescence.
Equitable estoppel by representations made and acted on, or by standing by silent, while another acts adversely in the exercise of what Tie claims as a right, is usually defined in terms involving as an essential -element, the fact that the party seeking to assert the estoppel has been misled to his prejudice. Many authorities gotso far as to assert that there must be what amounts to deceit; that the facts must be such that, unless the estoppel is allowed, they will have an effect equivalent 'to fraud. Doubtless in many cases such facts are of vital importance. But it is too much to say that misleading the party to act or omit to act, and to his prejudice, is essential to constitute a bar.- There are several classes of cases often confused with these, in which it is not mecessary for the party claiming the estoppel to show that he believed any representation, or that he did any act on the faith of it. Perhaps it might avoid confusion, if the use of the word estoppel were excluded •from the discussion of these cases, but, its use is so common that it *269 will aid to clear up the confusion, to use it in pointing to the discrimination here.
The most important of these cases may be roughly grouped, or classed as cases of the exercise of a right of election, cases of estoppel by contest in court, and cases of acquiescence is wrong. A case may partake at the same time of all of these characteristics, but they are-distinct in nature.
I. The election of a right.
It is an old maxim of the common law that if a man has an election, to do or demand one of two things, and he determines his election, it shall be determined forever.
Illustrations show that no misleading need he shown. A man. delivers an obligation to A for the use of B and B, when he hears of' it, refuses it. He is bound by the refusal. 1 Rolle, 726. A debtor having made an assignment for benefit of creditors, which is subject to. some question as to fraudulent character, creditors notify the assignee that they elect to accept and ratify it. They cannot revoke this-election unless they show it was made under mistake of fact. Levy v. James, 49 Hun, 181.
Perhaps the best recent authority against a very free application of" the doctrine of the conclusive effect of an election is Becker v. Walworth, 45 Ohio St. 169; s. c., 24 Reporter, 184. Speak, J., says: “ It may he said, as a deduction from the authorities on the subject, that an election is the making of a choice between two or more benefits or rights, which estops the party from afterwards denying that an election has-been made, and from demanding some benefit or right other than the one chosen. Except in cases where his conduct has been such as to mislead another party to his prejudice, the party having a right to elect must have proceeded upon the idea that he was bound to elect. He must have had knowledge of his obligation to elect as a matter of law. There must have been a purpose to elect, and an actual election. And where .the election is as to one of two or more remedies in order to make a selection of one a bar to a pursuit of the other, it must appear that they are inconsistent, and that' the one last sought is not merely cumulative. As applied to a claimed election under a will, Wood, J., in Melick v. Darling, 11 Ohio. 343, gives this definition: ' To create an election there must be a plurality of gifts or rights, with an intention, express or implied, of the party who has the right to control one of both, that one should be a substitute for the other.’ ”
In Becker v. Walworth, above cited, it was held that a landlord who after the death of his lessee received rents from the executor, receipting for him as received from hita as executor, and who-sued the executor as such for rents unpaid, was not thereby *270 estopped from amending so as to charge him personally. The court put .some stress upon the facts that the defendant had not been misled, that the insolvency of the estate was not known when the receipts were .given, and that the executor had been receiving a larger rent from a sub-tenant ; so that the lessor had two remedies, and was not bound to elect between them, but on the contrary his individual liability was founded on his possession in a representative capacity.
As to receiving money as an election to abide by the theory of right on which it was paid, compare opinion of Woodruff, J., in Boerum v. Schenck, 41 N. Y. 182, 191, and that of Grover, J., p. 197. The latter opinion seems in part, at least, supported by Huger, Oh. J., in 93 N. Y. 249, to the eSect that election once made is final.
Authorities on the subject of election as independent of any action in court, are numerous in the law of contracts.
II. Estoppel by contest in court.
This bar is founded not upon contract nor any contractual relation, but upon public policy, which does not allow a suitor to play fast and loose with the court. His representations in pleading, may or may not bind him, as towards the adverse party; but even if they do not, the case may be such that the court having been invoked to grant relief upon one aspect of his contention, should as matter of sound judical policy, refuse to allow him to shift his ground and present a wholly inconsistent aspect. The grounds and limits of this estoppel or bar, are less definitely settled than any other, for they involve not only •considerations of good faith, but also of judical convenience and discretion, and sometimes present a question which may be determined by “ the favor ” of the court.
The general principle seems well recognized that procuring a favorable determination of the court on a claim, bars the party from seeking to use the same facts as the ground of an inconsistent claim.
Also that invoking-the power of the court in one of two remedies, that are purely alternative as founded on inconsistent allegations (and not merely concurrent, as founded on inconsistent relief on consistent representations of fact), precludes the party from invoking its power by the other remedy. ,
For instance, one who has sold goods induced thereto by fraud, if, knowing the facts he sues for the price as on a valid sale,-cannot thereafter retake the goods by replevin as on a void sale; and.if he brings replevin or trover as on a void sale, he cannot afterward maintain an action on the contract. Wile v. Brownstein, 35 Hun, 68, and cases cited.
*271 So one who sues as upon contract to recover the value of property removed by the defendant from his premises, cannot afterward maintain' an action to recover damages for the act as a conversion, even though the defendant in the action for conversion is a third person not a party to the former action. This is not an equitable estoppel to which the rule that only a party or his privy can avail himself of it applies, but it is an estoppel by election. Terry v. Munger, 49 Hun, 560. The court here say, estoppel by matter in pais is not the only estoppel known to the law, for a preclusion in law which prevents a man from alleging or denying a fact in consequence of his own previous act, election or denial of a contrary tenor, is also an estoppel. As, for instance, public policy and good morals will not permit a man to come into court and obtain a judgment upon testimony shovving that he has sold goods to another, and then in another action to come into court and show that the goods were not sold but were wrongfully taken from him without his consent. Whenever the remedies are inconsistent and an election is made as to the remedy and prosecuted to judgment, with full knowledge of the facts, it is final as to the party making it.
It is upon this principle that although a party to a fraud is estopped from setting it up for his own advantage, yet nevertheless, if his adversary alleges and proves it as part of his own case, the guilty party will then be entitled to the benefit, while he incurs the disadvantage resulting from such a state of things [Broome’s Maxims, 322], and this principle applies as well to usury as to fraud. La Farge v. Herter, 9 N. Y. 241.
And in Sheppard v. Hamilton, 29 Barb. 156, this rule is approved, the court observing that to the same effect is the reasoning of Judge Allen in the same case below, reported in 11 Barb. 159.
So where a debtor defeated action on the security given by him by alleging usury therein by a sworn answer; whereupon plaintiff discontinued, and brought a new action on a previous security for the same debt, which had been surrendered on receiving as a substitute or merger the other security that had been alleged to be usurious—held, that the defendant having interposed his sworn answer that the substituted note was usurious and void, could not now deny that it was, and claim that the original security was therefore extinguished; and that, upon the same principle he could not even claim that plaintiff because a guilty party, was not to be heard to allege usury in his own transaction in taking the substituted security, for although guilty, he was entitled to take the benefit of what defendant -had alleged, Ib.
If a court has jurisdiction of the subject matter, a party who by making application procures it to act in a summary way,—as on motion or petition, instead of by suit or bill,—cannot afterward object to *272 want of jurisdiction. People ex rel. Jennys v. Brennan, 3 Hun, 666; s. c., less fully, 6 Supm. Ct. (T. & C.) 120; approved and followed in O’Brien v. Weld, 92 U. S. 81; rev’g, 53 N. Y. 642, where, however,, there is no opinion.
In Crowe v. Brady, 5 Redf. 1, it was held that the act of one-claiming to be the real owner of money deposited in savings banks by his wife, since deceased,—in taking out letters of administration on her estate for the purpose of getting the money, and in entering it in his-books as received by him as administrator, did not preclude him from explaining when called to account therefor, as administrator, from. showing that it belonged to him individually. The court (Calvin, Surr.) put the decision upon the ground that “It is of" very frequent occurrence that moneys deposited in the name of another, who is. deceased, are obtained by the owner through the instrumentality of letters of administration; and even if he made a formal inventory, and filed it under the statute, making a clear case, he could explain that inventory and overcome its force as a charge against him, by showing-that the property did not, in fact, belong to the estate.”
In a somewhat similar case Surrogate Dailey held the contrary, in Garvey v. McCue, 3 Redf. 313, where a husband obtained letters of" administration on his wife’s estate by oath that she left an estate, and filed an account stating her savings bank deposits to be her whole-estate, and showing that he had paid out the whole in funeral expenses ; and when called to account by a creditor of the wife, claimed that the money in bank was and always had been his own. The surrogate-said, “I think he is estopped by his own acts from claiming this-money as his or as not a part of her estate. If it was his there was no-necessity of administering upon it.”
The reversal in 14 Hun, 562, proceeded solely on the ground that the expenses were proper charges against the wife’s estate.
In Dater v. Willson, 36 Hun, 546, it was held . that heirs who obtained probate of a will in the surrogate’s court by presenting their verified petition and producing "witnesses to prove due execution, are not estopped absolutely as by an adjudication from afterward bringing ejectment to recover devised premises upon the ground that the will was not duly executed. This was put upon the ground that the probate of a will is not conclusive as to real estate; and the fact that" the plaintiffs themselves procured probate was held not to make it any more conclusive as an adjudication.
See, also, the fact that they procured a trustee to be appointed' under the probate to execute the will when the executors renounced, was held no estoppel; this on the ground that such an order is not air adjudication, nor a waiver in the absence of knowledge of an existing right.
*273 Such, conduct does not amount to an equitable estoppel unless it M shown that those claiming under the will have been influenced in their, action thereby. And it was held not enough to say that they have acquired rights if they have neither done nor refrained from'anything to their prejudice in reliance thereon.
If a foreign judgment was void for want of jurisdiction—in this case a divorce obtained without service—the party aggrieved is not estopped from taking advantage of the want of jurisdiction, when the judgment is set up here, merely by having previously brought a suit in the foreign jurisdiction to set it aside on the ground of fraud. Hoffman v. Hoffman 46 N. Y. 30 ; affirming 55 Barb. 269.
In Willis v. Kane (Supm. Ct. Penn. 1853), 2 Grant's Cases, 60, it was held that where the plaintiff below had a right to either a ea. sa. or a warrant to compel the judgment debtors to disclose their assets,- and the latter defeated the remedy on the warrant on the ground that the plaintiff was entitled to the former, the judgment debtors wer,e estopped from objecting to the ea. sa. And the court say; “ Pleading an erroneous judgment in bar of an action estops the party from afterwards reversing it on error. Where a man alleges a fact in a court of justice for Ms advantage, he shall not be allowed to contradict it afterwards. It is against good morals to permit such double dealing in a court of justice.”
In Glover v. Benjamin, 73 Ill. 42, it- was held that a party who caused a decree, which properly protected his interest in the subject of the suit, to be reversed, on the ground that it was given without his consent or request, was estopped to complain of a second decree in. which such interest was left unnoticed.
A party cannot get relief on one basis, and then seek a now chance to litigate on the suggestion that he has a defense which he did not see fit to rely on before. The rights of litigants must be settled by the judgment rendered between them, unless it is vacated. And a case in which the existence of an award is the fact on which the whole controversy depends, must be regarded as settling it beyond dispute. An averment of its validity is of necessity a denial of its non-existence, and if admitted on the record ends all controversy. So held, where it was sought to prove the invalidity of an award upon the trial of an action involving the rights of the parties under the subject matter of the award. Beam v. Macomber, 35 Mich. 455-457.
Where a divorced wife after the decree sued her husband as a feme sole to recover possession of personal property which she claimed to belong to her—Held, that she was estopped to question the validity of the divorce or appeal from the decree granting it. Baily v. Baily, 44 Penn. 274.
*274 In Blessey v. Kearny, 24 La. Ann. 289—a case of an alleged fraudulent judgment—it was held that a plaintiff was estopped from claiming the nullity of the judgment and at the same time claiming the proceeds of a sale of property made under it. [Citing many Louisiana decisions.]
In Philadelphia, W. & B. R. R. Co. v. Howard, 13 How. (U. S.) 307; 14 Id. 157, it was held that where a defendant defeated a former action by the same and another plaintiff, by setting up a certain instrument as the true contract of the defendant, in a subsequent action upon such contract, the defendant was estopped to dispute the genuineness of the same.
It was further held that this estoppel was available to the plaintiff although not especially pleaded by him, because of jho defendant’s plea of the general issue which permitted the plaintiff to avail himself of the benefit of the estoppel at the trial.
Exp. Mitchell, 1 De Jex Bankr. Rep. 257. A creditor cannot avail ihimself of the invalidity of a fiat in bankruptcy on the ground that the debtor was not a trader, after he has prevented the bankrupt from obtaining relief under another statute on the sole ground that he was such a trader.
In Hunt v. Blackburn, 127 U. S. 774, it was held that one who litigates on grounds involving the fact of a communication between himself and his attorney, waives the right to object to the attorney’s testifying thereto. In this case it was sought in the court below to hold Mrs. Blackburn estopped by the fact that she had sought and obtained decrees in other courts, inconsistent with her present position. In her answer she insisted, however, that the part she took in the litigation of these two cases was the result of misplaced confidence in her counsel, by whom she now alleged she was deceived, misadvised and misled; that she was ignorant of her rights ; and that she ought not to be held estopped in the premises. At the same time it was objected on her behalf, that her attorney, on the ground of privileged communications, should not be permitted to defend himself by testifying to the facts and circumstances under which he advised her and the advice which he actually gave.
The court, in an opinion by Chief Justice Fuller, after adverting to the ground of privilege, and the rule that if the .client has voluntarily waived the privilege, it cannot be insisted on to close the mouth of the attorney, said when Mrs. Blackburn entered upon a line of defense which involved what transpired between herself and Mr. Weatherford, and respecting which she testified, she waived her right to object to his giving his own account of the matter. As, for instance, when she says that the original deed from Shepard was drawn by Weatherford, that *275 she has not got it; and that she thinks she gave it to him, it is clear that her letter of July 6, 1875, calling for that’deed, and Weatherford’s Teply of July 14, enclosing it, are admissible in evidence.
Conduct before suit influencing the suit, rests usually on facts constituting an equitable estoppel or an election.
If defendant admits possession of real or personal property and thereby induces the plaintiff to bring his action for recovery or to omit to join another person as the one in possession; the defendant, if the other elements of an equitable estoppel are present, is estopped from showing that his admission was false for the purpose of defeating the Action. Finnegan v. Carraher, 47 N. Y. 498.
Where the insured has served preliminary proofs upon the insurers, he will not be allowed on the trial to show that the facts were different from those stated, if the insurers have been prejudiced in their defense by relying on the statements contained in the proofs. In these cases the question is one of equitable estoppel. Campbell v. Charter Oak Ins. Co., 10 Allen, 213; Irving v. Excelsior Ins. Co., 1 Bosw. 507, as explained in 22 Wall. 36. Compare, however, McMaster v. Ins. Co. of N. Am., 55 N. Y. 222; affi’g 64 Barb. 536; Parmelee v. Hoffman Fire Ins. Co., 54 N. Y. 193.
“ Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law. [Gould v. Banks, 8 Wend. 562; Holbrook v. Wight, 24 Id. 169; Everett v. Saltus, 15 Id. 474; Wright v. Reed, 3 Durnf. & E. 554; Duffy v. O’Donovan, 46 N. Y. 223; Winter v. Coit, 7 Id. 288; Railway Co. v. McCarthy, 96 U. S. 258, 267.]’’
In this case (Railway Co. v. McCarthy) the defendant, the railway company, when sued for negligence in performing its contract to carry cattle, proved that it was not able to send them on Sunday for want of cars and sent them at the first opportunity; and in the appellate court claimed that it were not bound to ship merchandise on Sunday. The court say this point was an after-thought, and lay down the principle above stated.
III. Acquiescence in a wrong.
This is very usually one element in an equitable estoppel, that class of equitable estoppels in which the other party is misled by the acquiescence to do what the undoing or condemnation of will work to his prejudice.'
But where there has been no misleading or is no evidence of mis *276 leading, the mere acquiescence is often treated, in equity suits particularly, as a reason for the court refusing to interfere. • There is no-settled rule on this subject, and there is hardly any question frequently contested in courts of equity upon which the courts have declared a principle with so much unanimity and shown such great variance in its-application. A few recent cases will afford a sufficient clew for the present purpose.
In Mendez v. Holt, 128 U. S. 514, delay to sue for an injunction-against an infringement of trademark was urged as an acquiescence in the wrong sufficient to require the refusal of relief. The court in an opinion by the chief justice, after reverting to cases of waste as well as-of trademark, say: “ So far as the act complained of is completed, acquiescence may defeat the remedy on the principle -applicable when, action is taken on the strength of encouragement to do it, but so far as the act is in progress and lies in the future, the right to the intervention of equity is not generally lost by previous delay, in respect to-which the elements of an estoppel could rarely arise. At the same time, as it is in the exercise of discretionary jurisdiction that the doctrine of reasonable diligence is applied, and those, who seek equity must do it, a court might hesitate as to the measure of relief, where the use, by others, for a long period, under assumed permission of the owner, had largely enhanced the reputation of a particular brand.”
The principle of this decision is well stated in the words that where-mere knowledge and silence is relied on, acquiescence is a revocable-license, and lasts no longer than the silence from which it springs.
' The strongest cases to the contrary, that is to say holding mere silence to be in effect assent, are those which have applied such a rule-in favor of corporations and those dealing with them and against stockholders ; but it should not be overlooked that in many, and perhaps the majority of such cases, acts were shown to have been done on the-faith of the acquiescence such as to justify an inference of estoppel. Some important qualifications on the doctrine of acquiescence, as it has-often been applied against stockholders, will be found in Metropolitan Elevated Railway Co. v. Manhattan Railway Co., 14 Abb. N. C. 103, 106, 210, etc.
A very marked instance of the true rule, that mere acquiescence cannot alone amount to an estoppel, is seen in the principle that a trustee of any kind who acquiesces or even actively participates in a breach of trust committed by his co-trustees is not estopped from turning back, and as trustee suing his co-trustees to compel a rectification of the wrong. Wetmore v. Porter, 92 N. Y. 76; s. p., 14 Abb. N. C. 106, note.
*277 LANDSBERG v. LEWIS.
In this case, recently decided in the Fourth District Court of the City of New York (January, 1889), it was held, 1. that where an employee, under contract for a compensation, consisting in part of salary and part of commissions on sale, is wrongfully discharged and brings an action solely for damages for such discharge and recovers thereon, he is not entitled to maintain a second action to recover the .loss of commissions which, but for the wrongful dismissal, he might have earned during the term of the contract; and it makes no difference that on the trial of the former action he offered evidence in support of a claim of such commissions, and the court erroneously excluded it and refused to allow him to withdraw a juror, expressly upon the ground tthat he might maintain a separate action therefor.
2. The proper course for plaintiff, when part of an entire cause,of action is excluded erroneously by’the court, is to discontinue and sue .again, or to review the erroneous ruling by a direct proceeding in the same action. If he submits to the ruling and takes and enforces judgement for part of his cause of action, he cannot afterward maintain a fresh action for the residue.
M. Fsberg, for plaintiff.
M. Fox, for defendants.
Steckler, J.—This action is brought by Moses G. Landsberg, as •the assignee of Meyer Nebenzahl, to recover §100 damages for breach of contract. The defense, among others, is the plea of estoppel by áormer judgment.
It appeared that Nebenzahl commenced an action against the above named defendant in the city court to recover §500 damages for* the breach of a contract of employment. On June 15, 1887, he recovered a judgment for $100 and costs, which was paid. The complaint in that action alleged that on or about January 6, 1886, the defendants made and entered into a contract with Nebenzahl whereby they agreed to and did hire and employ him as salesman for a term of six months, •commencing on or about January 11, 1886, at a salary of $10 per week, and in addition thereto agreed to pay him a commission at the rate of 5 per cent, on all retail sales and 2 1-2 per cent, on all wholesale sales made by said Nebenzahl for the defendants.
That under said agreement, Nebenzahl entered into the defendants’ •employment, and rendered services for them up to and including March 23, 1886, when he was dismissed from his said employment.
On the trial of the action in the city court, Nebenzahl was not permitted, under the ruling of the court, to give any testimony ujDon the *278 question of the commission account, upon the ground that the claim for commissions was not properly pleaded or set forth in the complaint.
The attorney for Nebenzahl asked leave to withdraw a juror in order that the complaint might be amended, but this application was. denied, the court holding that a separate action could be brought on account of the damages for the loss of commissions.
This action is two-fold: 1st. For the recovery of the commissions earned and due at the time of the discharge, and 2nd. Damages for the wrongful discharge by which Nebenzahl was deprived of earning his commissions on sales which he might have made from the date of dismissal to the end of the contract.
Nebenzahl on this trial made no claim for salary. His-damages, were confined to the loss of commissions. The evidence showed that his average commissions were about $18 or §20 per week prior to his discharge, "and that, during the balance of the term for which he was employed, the commissions would have been much higher, for the busy season would have set in. It also appears that at the time he was dismissed the defendants owed him $10.41 for commissions which he had. already earned. '
This suit being for breach of contract, the plaintiff, as the action, now stands, cannot even recover the commissions due at the time of' discharge, but Í shall amend the plaintiff’s complaint so as to conform it to the proof, by adding an additional cause of action, “for money due on contract.” This will enable me to consider the question as to whether the plaintiff can recover this claim.
The defendants maintain that, by the former judgment, the plaintiff is estopped from claiming any money due under the contract or damages for the breach thereof.
"Under the authorities it is clear that the plaintiff can recover the commissions earned and due at the time of the discharge.
The case of Perry v. Dickerson (85 N. Y. 345), is authority on this-point. Plaintiff brought an action to recover damages for an alleged wrongful dismissal from defendant’s-employment before the expiration of the stipulated term. It was held that the judgment therein was not; a bar to a subsequent action to recover wages and commissions earned during the time plaintiff was actually employed, and due and payable before the wrongful dismissal; that the two claims constituted separate- and independent causes of action, upon which separate actions were maintainable.
Nebenzahl neither in his complaint nor on the trial of the first action claimed to recover the commissions earned. It was an action-solely for damages for the wrongful dismissal.
The claim for commissions earned and due before the dismissal and *279 damages for the wrongful dismissal constituted two separate and independent causes of action.
The right to recover the commissions was complete and perfect before the right to damages accrued. Upon the wrongful dismissal a new cause of action arose, wholly disconnected in its origin and nature-with the claim for commissions.
The suit for commissions is brought to recover for services rendered ;. the action for wrongful dismissal, to recover compensation for the losa of a situation, and for not being allowed to serve and earn wages under the contract.
The wages could not have been proved or recovered under the pleadings in the former action, but as to the other item of damage, to wit, the loss of commissions on sales that might have been made but for the wrongful dismissal, I am equally clear that no recovery can be had. I think the defendants’ position on this branch of the case is impregnable.
The plaintiff has but one cause of action, for the breach, which accrues to him at the time of his wrongful discharge. One recovery is a bar to any other growing out of the breach. The plaintiff, by a proper complaint in the first action, could have proved his damages in the loss of commissions from the time of his dismissal till the end of the contract, and the fact that no evidence was given on that trial on the. commission account does not prevent the former judgment being considered a complete adjudication of the entire claim for any and all damages arising out of the wrongful dismissal.
In Secor v. Sturgis (16 N. Y. 548, 553), it was said that the principle is settled beyond dispute that a judgment concludes the rights of the parties in respect to the cause of action stated in the pleadings on which, it is rendered, whether the suit embraces the whole or only part of the-demand constituting the cause of action. It results from this principle and the rule is fully established that an entire claim, arising either upon, a contract or from wrong, cannot he divided and made the subject of several suits, and if several suits be brought for different parts of such claim, the pendency of the first may be pleaded in abatement of the others, and a judgment upon the merits in either will be available as a bar in the other suits.
And it was further held in Secor v. Sturgis (supra), that in the case of torts each trespass or conversion or fraud gives a right of action, and but a single one, however numerous the items of wrong or damage may be. In respect to contracts, express or implied, each contract affords one and only one cause of action.
Nathans v. Hope (77 N. Y. 420), hold that an entire indivisible, demand cannot be split up into several claims, so as to make it the *280 subject of two or more separate actions, and that where a claim arises upon a contract, or from a tort, the entire claim must be prosecuted in a single suit, and several suits cannot be brought for separate parts of such claim.
But the plaintiff here claims that, by the direction of the justice on the trial of the former action in excluding all matters connected with the claim for damages on account of the loss of commissions, upon the theory that a separate action may be maintained therefor, he should be-now entitled to recover. This plea is of no avail. When the court refused - permission to withdraw a juror for the purpose of enabling the amendment of the complaint the plaintiff could have discontinued his action, but by proceeding to judgment and only proving a part of his damages he took the risk of the attending consequences. The consequences of such a course are obvious. He is now barred from proving any other damage he has suffered.
In Goodman v. Pocock (15 Ad. and Ell. N. S. 376) the plaintiff was dismissed in the middle of a quarter, and had brought a former action, joining in the declaration counts in assumpsit for work and labor, etc., with a special count for a wrongful dismissal. On the trial of that action the judge ruled that the plaintiff could not recover for services in the broken quarter, under the special count, because whatever might be duo for such services -was recoverable under the indebitatus assumpsit count only, and that no recovery could be had under that count, because the claim was not included in the particulars. Afterward, the plaintiff brought his action to recover for services in the broken quarter, and it was held that those services should have been proved and allowed as damages in the first action, under the special count, and that a- second action therefor could not be maintained. The misdirection of the judge in the first action did not prevent the judgment therein operating as an estoppel, upon the well-settled rule that such errors are to be corrected by a direct proceeding in the action in which they were committed, and, besides, in the case of Perry Dickerson (supra), the court said: “The law to prevent vexatious and oppressive litigation forbids the splitting up of one single or entire cause of action into parts, and the bringing of separate actions for each, and neither in this way nor by withholding proof of particular items on the trial, or by formally withdrawing them from the consideration of the jury, can the effect of the judgment, as a complete adjudication of the entire cause of action, be prevented. There can be but one recovery for an injury from a single wrong, however numerous the items of damage may be, and but one action for a single breach of contract.”
It follows, therefore, from the views expressed herein, that the plaintiff is entitled to a judgment for $10.41, with costs.