WARD, J.
McGraw, the deceased, at the time of his death, resided in the city of Niagara Falls, in this state. He was a bachelor, and his heirs at law were James McGraw, a half-brother, and his sister, the respondent. The sister resided in Lockport, Niagara County. The depeased lived with James McGraw, who was a married man, residing with his wife" at Niagara Falls. The deceased left but little personal property, and, as near as we can judge, about $10,000 in value of real estate. The father of the parties died some time before, leaving a last will and testament, in which he devised his property to James and Peter. This was not satisfactory to Margaret, and she contested the probate of the will for a time, and out of this controversy grew ill feeling between the deceased and *873 the sister, which continued to the time of his death. He had not visited his sister for 20 years prior to his death. The deceased was taken ill on Thursday morning, April 11,1895, with a liver difficulty of a severe character, and during Thursday was to some extent in a comatose condition. A physician, Dr. John A. Lannigan, was called to attend him. He visited the deceased several times that day, administered medicine to relieve and stimulate him, and also visited him several times on the Friday following; the last visit being that day, about 8 o’clock in the evening. The effect of the doctor’s evidence is that the deceased was better and brighter on Friday evening, and in the possession of his faculties, talked intelligently, and. was in a condition to comprehend the extent and nature of his property, and the persons who would have natural claims upon it, from him, by reason of relationship or otherwise; and it is the opinion of the doctor that he was capable of making a will.
The proponent, Joseph McDonald, a friend and neighbor of the deceased, who had1 known and been intimate with, him for many years, learning that the deceased was very ill, and likely to die, consulted with the doctor about the propriety of the -deceased’s making his will, and they together saw the deceased shortly before the will was made, and stated to him that he was a sick man, and, while they hoped he would survive, he might not, and, if he wished to make any disposition of his property, he had better make a will. The deceased manifested some reluctance about that, without stating the ground of such reluctance, but, upon being advised further by these gentlemen to make the will, he concluded to do so; and he vas asked what attorney he would have to draw the will, and a number of attorneys were named over to him who could be obtained for that purpose, whom he did not seem to favor. Finally the name of T. F. C. Oleary was mentioned to him, and he accepted him. Mr. Griffin, a neighbor and friend of the deceased, and who afterwards became a witness to the will, and McDonald, went to Mr. Oleary’s house, and directed him to come to the deceased, and to prepare a will. Mr. Cleary soon came to the house, and he and McDonald .entered the room of the sick man, where they found the deceased with his face turned towards the xvall. He seemed to be quiet or asleep. When McDonald aroused him, he turned upon his back, where he could see the parties. He was informed that Oleary was there, and he was asked how he wished to dispose of his property. McDonald testified that the deceased said he wanted to leave it to “ Jim and his wife” (being his brother, James, and his wife). Oleary testified that he said he wanted to leave it to the “two of them,” and, upon his inquiring what the deceased meant by that, McDonald stated, “ James and his wife.” Oleary testified that the deceased appeared- to be a very sick man; that he had not been acquainted with him before, and did not know how he appeared when well; and that, aside from his statement as *874 to the “ two of them,” he made no intelligent statement in his. hearing during the progress of the business down to the completion of the will; but when asked questions, and when the will was read oyer, the deceased gave some indication of assent, or gave some indication of what he wished. McDonald, who appears to have been closer to the deceased while the transaction was going on, testified that he heard several statements from him, as will be hereafter stated. Cleary then left the room, to draw the will in another room. A question seemed to arise between Oleary and McDonald about whether anything was to be given to the sister Margaret, and some conversation was had between those parties that it would be better if Margaret was given something, as it would show that the deceased had her in mind. At all events, it was concluded that the deceased’s attention had better be called to her. McDonald went back into the room where the deceased lay, and testified that he had the following conversation with him upon the subject:
“6 Pete [the deceased], ain’t you going to leave your sister anything ? ’ And he said: 6 No.’ Says I: ‘ Why ? ’ Says he: ‘ Because she didn’t act right the time my father made his will.’ Says I: ‘We should forgive all those things, and not. think of such things. You might die, and that would be a. queer thing to answer for; you have hard feelings against, your sister.’ He thought for a while, and says: ‘ I don’t care. He can mark down $500 for my sister.’» And I asked him when it should be payable, and he said: ‘ Whenever it will be convenient for my brother to pay it.’ ”
On his cross-examination upon this subject, he did not vary the effect of this statement, but he added to it that the deceased said the sister contested the father’s will, when she had no right to; that he and his brother had always helped her when she needed it, and she had no right to do as. she had done; and that he would leave her some property were she worthy of it, but concluded, “ I don’t care if I leave her four or five hundred dollars.” The will being prepared, it was taken to the deceased, and in the presence of Morris Griffin and of McDonald, all close to the bedside of the deceased, Oleary read the will over to him; and Cleary.testifi.es :
“ I read the will to the sick man, and I stated to him that it would be necessary for him to declare the will to be his will; that it would be necessary for him, or well for him, to ask those whom he wanted to subscribe as his witnesses, ancl to comply with the formalities of executing the will; and he did not ask those questions; did not seem to be able to. So I asked him if it was his will, and I asked him if he wanted myself and Mr. Griffin to sign it, and we signed it, and that is all there was to it. He was a very sick man, as sick a man as I ever met; and, of course, he did not do any talking at all. He carried on the conversation with Mr. McDonald; that he seemed to understand. He was groaning. I can’t describe *875 just exactly how he was, but he said something or articulated something" that these people advised me was an assent. I, of course, had to take it that way, and myself and Mr. Griffin did sign as witnesses. We signed on a stand that was near the head of the bed, and I had the pen in my hand, and I brought the pen over in front of him, and then myself and Mr. Griffin both signed that, in the presence of the sick man, and in the presence of each other as witnesses.”
He further testified that the decedent made his mark to the will, he (the witness) steadying the pen; and he did testify during his examination, in effect, that, when he asked these questions of the deceased, he gave an indication of assent, but not in words. This witness stated that the will was executed about 12 o’clock on Friday night. McDonald testified that, after he had gone back into the room where Oleary was writing, and told him about the $500 for the sister—
“ Then Mr. Cleary completed the will out in the other room. He marked it down', and then himself, Mr. Griffin, and myself went back into the sick room. When we got back into the sick room, Mr. Cleary read the will, and asked him if he understood it, to which Peter said, plainly,‘Yes.’ He asked him still further, ‘ Is everything satisfactory in the way that the will is made up?’ to"which Peter responded,‘It is all right;5 and I saw the signing done. I saw Peter have his hand on the end of the pen, while Cleary was making his mark, and then I saw Mr. Cleary and Mr. Griffin sign as witnesses.”
The witness further testified that the deceased was a quiet man, and had usually nothing to say unless in response to questions asked him. In this regard several other witnesses in the case concurred.
The witness Griffin testified that he was in the room; that Cleary read the will over to the deceased; that he saw Peter sign the will, by making his mark; that afterwards he and Cleary signed the will as witnesses, which was done in the presence of the testator, and in the presence of each other. This witness stated that he saw Peter often during his sickness, and talked with him, and that, in his opinion, he was of sound mind and understanding, and competent to make a will, and under no restraint.
T. Y. Welch was sworn for the proponent, in which he testified to an intelligent conversation he had with Peter about 5 o’clock in the evening of Friday; that he had known him a long time, and was well acquainted with him; and that he noticed nothing in his condition on that evening that was unusual or different from his ordinary condition, except that he was ill with somewhat of the heaviness which comes from illness.
William Shepherd was sworn for the proponent, and testified that he had been intimately acquainted with Peter for many years; that the last time he saw him was either Friday *876 morning or the Saturday morning following, at his home, and he detailed an intelligent conversation with Peter about his health and his business, and he was asked this question:
“ Q. Mentally, what was his condition. Í want to know what you noticed about his condition ? A. His condition was just the same as I have ever seen him, any more than he seemed to be more distressed; pain in his breast, sort of pain. He was ordinarily a very quiet man, and talked very little.”
' The witnesses we have named were the only witnesses sworn in the case before the surrogate except Peter Landrigan, a son of the sister, who simply testified that there had been difficulty between the deceased and his sister, and that their relations had been strained for many years, and that his sister had four children, and was a widow of 65 years of age.
Oleary testified to some conversation with McDonald not in the presence of the deceased; that McDonald suggested that, unless- Margaret was remembered in the will, she migjit contest it, as she had done with her father’s will, and make trouble; and that he (Cleary) said it would be well enough to mention her anyway, because it would show that the deceased had her in mind when making his will. This McDonald does not remember. It also appeared that James (the brother) said to Oleary, though not in tire presence of the deceased, that he could not pay the $500 to Margaret under four years, as it would have to be got out of the land, or something to that effect. It does not appear that either James or his wife communicated in any manner with the deceased, or sought in any manner to influence him in the making of his will. Neither of them was present at any of the interviews with him as to the making of the will, or upon its execution. They Avere both in the house at the time' of the making of the will, and James had some talk with McDonald or Oleary, and seemed to to be aware of Avhat Avas .going on, and made the remark about the payment of the $500 as above stated. The evidence utterly fails to disclose, hoAvever, any influence of either James or his Avife upon the deceased. McDonald denies that his action in the premises was instigated by James.
The counsel for the respondent severely criticises McDonald, and claims that he, substantially, made the will in question, in the interest of the beneficiaries thereunder. It seems that the names of McDonald and the brother James, as executor's, Avere inserted by Oleary in the will but not at the suggestion of either McDonald or James in his oavb behalf; and Avas only made known to the deceased upon the reading of the Avill. Nothing ■ appears against the character or integrity of McDonald, or that he Avas to receive any benefit under the Avill or otherwise, unless, possibly, such benefit as might come to him as one of the executors. Cleary, when asked as to the mental condition of the deceased at the time of the making of the Avill, stated that he was not able to give an opinion, in effect, upon the subject, giving as a reason the extreme sickness *877 or illness of the deceased, and his want of prior knowledge of his character and condition. He, however, signed the attestation clause of the will, which contains the usual recital that the deceased, in the presence of the witnesses, declared the will to be his last will and testament, and that they had subscribed it as such in his presence, and in the presence of each other, and at the request .of the deceased. The will devised and bequeathed all the real and personal property of the deceased, after the payment of his debts, to James McGraw, and §500 to be paid to Margaret within four years after the death of the. deceased, which was made a charge upon the real estate, and appointed James and McDonald as executors. It should have been stated that, when the deceased expressed the wish to will his property to James and his wife, Oleary suggested to him that it would be better to leave it all to James, as his wife would be taken care of in that event, and it would be shorter, and to this Peter assented, as the evidence discloses.
The learned surrogate made findings of fact, and reached the conclusion of law which appears in the record. He finds : First. That the witnesses Oleary and Griffin signed the paper propounded as the last will and testament of the decedent ; that the same was not signed by the said decedent, but his mark was affixed thereto. Second. That, at the time of the execution of said instrument, the said decedent was not of sound mind and memory, and was not competent to make a will. Third. That the said decedent was unduly and improperly influenced in making and executing the said instrument. And he finds, as a conclusion of law, that “ the instrument so Propounded as the last will and testament of decedent, Peter IcGraw, is null and void, as and for the last will and testament of said Peter McGraw, deceased.”
While we do not wish to give our impressions of the effect of this evidence, as we have decided that there shall be a jury trial of the matter, as we shall provide hereafter, we must, nevertheless, state to some extent the conclusions we have reached upon this evidence, and give the reasons for our conclusions. The surrogate fails to find in express terms that the decedent executed and published the will with the formalities required by statute, but does find that, while it was not signed by the decedent, his mark was affixed thereto, and the second and third findings of fact seem to assume a proper execution of the will by the decedent under the form prescribed by statute, in finding that he was not of sound mind and memory at the time of such execution, and that he was unduly influenced in making and executing it.
Hpon, the first ground, viz. that the decedent was” not of sound mind, we fail to discover sufficient evidence to sustain this proposition. Hot an irrational act or word on the part of the deceased in connection with this whole affair appears in the evidence. The want of ability to speak fully and to discharge the duties in connection with the execution* of such an instru *878 xnent that testators usually perform seems to have been clue entirely to his illness. And the precise question which should be passed upon in this regard is whether he was so far gone with his illness, or suffering such pain and disquietude therefrom, that he did not properly comprehend what he wms doing, and act intelligently upon the subject. It does not follow, because a man is in extremis, that his will is to be rejected, because we know that men foolishly postpone this most important act until the shadows of the grave are creeping over them, and they feel admonished that they must act then, if at all, in the final disposition of their property; nor does it follow, because a man is weak of understanding, and physically weak, that his will is to be rejected, because the law only requires of him that he should comprehend the nature and extent of his property, and who have just or natural claims upon his bounty in its disposition. But, in determining the testamentary capacity with greater care and solicitude, we look into the case, and adopt a more rigorous rule where the decedent is weak and suffering than if m comparative health; and, applying this rule, thus laid clown, we are unable to concur with the learned surrogate in his conclusion that the deceased was incompetent to make this will. His two relatives (his brother and his sister) were the natural objects of his bounty. With his brother he lived in peace and affection, and confidence seems to have existed between them. From his sister he had been long estranged, growing out of a bitter family feud, and it is immaterial which is to blame in that controversy. A reason appears why the decedent, whether in health or in sickness, might well prefer the brother to the sister ; and therefore his will, in regard to the beneficiaries, is consistent with his natural inclinations.
As to the other ground for rejecting this will (undue influence), our conclusion is foreshadowed in the statement already made. Hnclue influence is of two kinds,—one, of coercion or threats of injury; the other, in which the mind of the person is wrought upon through constant persuasion, continued until the victim, for the sake of peace, is compelled to surrender (In re Soule [Surr.], 3 N. Y. Supp. 259); or as stated in another case: “ It must be shown that the influence exercised amounted to moral coercion, which restrained independent action, and destroyed free agency, or that, by importunity which he was unable to resist, the testator was constrained to do that which was against his free will and desire.” Aid Society v. Loveridge, 70 N. Y. 387; In re White (Sup.), 5 N. Y. Supp. 295. undue influence must be alleged by the contestant, and the burden is upon her to establish it. This is a familiar principle. Ewen v. Perrine, 5 Redf. (Surr.) 640 ; Redf. Prac. Sur. Ots. (4th ed.) 197, and note 2. At least, the undue influence must appear of the character that the rule requires in the evidence.
The respondent, however, claims that the decedent was in *879 duced to make a will at the interposition, of others, especially of McDonald, and therefore the will should be rejected. It is frequently the case that the friends of a sick man will discover what he has not discovered, that his end is near; and they give friendly advice that he should make his will, and if he, upon proper consideration, follows that advice, it is neither coercion nor undue influence, unless the person so advising takes a substantial benefit under the will, and then it may amount to a reason why the will should be rejected. McDonald did advise the making of a will. He did advise the deceased to become reconciled to his sister, and make a bequest in her favor. He did not assume to name the amount, and but for this -advice, doubtless, no provision would have been made for the sister. We do not discover in this a reason for rejecting the will, but the evidence upon this subject maybe important in considering the question of the mental capacity of the deceased.
The learned counsel for the respondent presses with great earnestness the proposition that, notwithstanding the apparent acquiescence of the surrogate in the claim that the will was executed with the formalities required by the statute, it does not appear to have been done so, and that we should pass upon that question de novo, and, if we find that the will was not properly executed, we should still sustain the surrogate’s decree; and the chief complaint that is made is that the will was not signed nor published by the testator, or witnessed by persons selected by him, as the statute requires. The will "was read over in the presence of the deceased and the witnesses. It Avas prepared by one of the witnesses. It was signed at the end of the will by the mark of the deceased, it appearing in the evidence that he could not write. He was asked by the Avitness Oleary, if he declared the will to be his last will and testament, and requested the witnesses to sign as such. He made an assent to that question,—all the assent that he AAras physically capable of making. The witness McDonald, the person nearest to deceased at the time, heard him distinctly state that it was right, and as he desired it. Any act of a testator in the presence of the witnesses at the time of the execution of the will that tends to show that he desires to publish the paper as his will, and that he wishes the witnesses to execute it, may be considered. In re Hardenburg’s Will, 85 Hun, 580, 66 S. B. 775, and cases cited.
In Be Perego’s Will (Sup.), 20 N. N. Supp. 394, 395, Judge Dwight says:
“ A man is not to be denied the right to make a testamentary disposition of his property on account of defect of speech and hearing; and a deaf and dumb man may make a will if only the formalities prescribed by statute are observed in their spirit and intent in such manner as is practicable under the condition existing.”
And in Thompson v. Sesstedt, 6 Thomp. & C. 80, affirmed *880 in court of appeals, sub nom. Thompson y. Stevens, 62 N. Y.. 634, Judge Daniels says :
“ Although she [testatrix] did not, according to the testimony which was given, in words declare the instrument to be her will, it is clear that she treated it and designed the witnesses-to understand it to be such. That was equivalent to such a declaration, and sufficient to satisfy the requirements of the statute upon the subject, for that does not necessarily contemplate such a declaration in words, in order to render the instrument valid as a will.”
And the court of appeals says, in Re Nelson’s Will, 141N. Y.. 152, 56 S. R. 678, the request to sign is sufficient if made-by the person superintending the execution of the will, in the-hearing of the testator, and with his silent permission and approval.
There are some differences between the witnesses upon important questions of fact in this case, and also different inferences may be drawn from the testimony as to such facts. It. is important to the rights of these parties that the question of the due execution and publication of this will should be definitely and clearly passed upon.
We have reached the conclusion that the decree of the surrogate of Niagara County should be reversed upon questions of fact, and an order should be made directing the trial by a jury of the material questions of fact, arising upon the issues between the parties upon issues to be stated ; the trial to take place at. a trial term of the supreme court in the county of Niagara,. pursuant to section 2588 of the Code of Civil Procedure, and that the costs of this appeal be payable out of the estate.
All concur, except GREEN and ADAMS, JJ., dissenting.